RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SCHOENING INVESTMENT LP,

        *Plaintiff-Appellant*,

   *v.*

CINCINNATI CASUALTY COMPANY,

        *Defendant-Appellee*.

No. 25-3273

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:24-cv-00137—Douglas Russell Cole, District Judge.

Argued: March 18, 2026

Decided and Filed: March 25, 2026

Before: SUTTON, Chief Judge; GRIFFIN and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** T. Joseph Snodgrass, SNODGRASS LAW LLC, Minneapolis, Minnesota, for Appellant. Aaron M. Stevenson, BAKER & HOSTETLER, LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** T. Joseph Snodgrass, SNODGRASS LAW LLC, Minneapolis, Minnesota, J. Brandon McWherter, MCWHERTER SCOTT BOBBITT PLC, Brentwood, Tennessee, Erik D. Peterson, ERIK PETERSON LAW OFFICES PSC, Lexington, Kentucky, for Appellant. Aaron M. Stevenson, Rodger L. Eckelberry, Graycen M. Wood, BAKER & HOSTETLER, LLP, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

SUTTON, Chief Judge. Schoening Investment insures its Kentucky properties with Cincinnati Casualty. When Schoening filed a claim with Cincinnati Casualty, the insurer offered

to pay the cost of repairs less a deduction for depreciation.  Schoening rejected the offer and filed this lawsuit, proposing to lead a putative class and arguing that Cincinnati Casualty improperly deducted depreciation from repair cost payouts.  The district court dismissed Schoening's claim after concluding that the policy authorized Cincinnati Casualty to do just what it did.  We agree and affirm.

I.

Schoening is a Florida-based limited partnership that invests in commercial real estate.  Some years ago, Schoening purchased commercial insurance for its Kentucky properties from Cincinnati Casualty.  As relevant here, Schoening purchased additional coverage that paid for repairs "without deduction for depreciation" if Schoening repaired the property, at least so long as those repairs commenced within two years of a covered loss.  R.4-1 at 58–59.

In March 2022, one of Schoening's insured commercial properties in Kentucky suffered damage.  Schoening timely filed a claim with Cincinnati Casualty, seeking recovery under its commercial property insurance policy.  Cincinnati Casualty's adjuster found that the damage could be repaired and that the property did not require replacement.  The adjuster determined that Schoening had not repaired the property, making it ineligible for a payment without deduction for depreciation.  The adjuster accordingly offered Schoening the cost of repairs less a $45,000 deduction for depreciation.  The adjuster explained that Schoening could later recover those depreciation costs "[o]nce the repairs have been completed."  R.13-1 at 2.

Unhappy with that determination, Schoening sued Cincinnati Casualty on behalf of itself and a putative class in March 2024.  Schoening claimed that Cincinnati Casualty breached the terms of the insurance policy by improperly deducting depreciation from its repair-cost settlements.  Cincinnati Casualty filed a motion to dismiss for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  The district court granted the motion, reasoning that Schoening had not qualified for a depreciation-free deduction.

II.

The parties agree, and the district court concluded, that Kentucky law applies to this dispute. An insurance policy amounts to a contract, the meaning of which presents a question of law. *Foreman v. Auto Club Prop.-Cas. Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021). Kentucky respects the language of insurance contracts, reads their provisions in context, and enforces them as written. *Century Aluminum Co. v. Certain Underwriters at Lloyd's, London*, 97 F.4th 1019, 1022 (6th Cir. 2024) (citing *Foreman*, 617 S.W.3d at 349–50). No party disputes any material facts. What we have as a result is a legal question of contract interpretation: Does the insurance policy permit Cincinnati Casualty to deduct depreciation in this instance?

The insurance policy provides a roadmap for answering the question. By the terms of the policy's "Loss Payment" provision, Cincinnati Casualty has four options for remedying Schoening's loss and may choose the least expensive among them. R.4-1 at 52. It permissibly elected the second option, which requires it to pay "the cost of repairing or replacing the lost or damaged property." R.4-1 at 52. That provision directs Cincinnati Casualty to "determine . . . the cost of [the property's] repair or replacement in accordance with the applicable terms of" the "Valuation" provision. R.4-1 at 52.

The Valuation provision, in turn, provides the means of valuing the property. Its default term directs Cincinnati Casualty to "determine the value" of the property at "Actual Cash Value," except as otherwise provided in the Valuation provision. R.4-1 at 55. The only other applicable term is the provision's caveat that the cost of repairs may not include costs attributable to construction code changes. R.4-1 at 55. The policy proceeds to define "Actual Cash Value" as "replacement cost less a deduction that reflects depreciation." R.4-1 at 59. This default "Actual Cash Value" payment thus places the insured "in as good a condition . . . as [it] would have been in had no [loss] occurred." *Am. States Ins. Co. v. Mo-Lex, Inc.*, 427 S.W.2d 236, 237–38 (Ky. 1968).

The contract contains one other relevant feature. Schoening paid for "Optional Coverage" that modified the Valuation provision. R.13-1 at 4. The Optional Coverage provision "replaces" the term "Actual Cash Value" with "Replacement Cost [] without deduction for

depreciation." R.4-1 at 58. This full replacement-cost payment anticipates the "shortfall in coverage" that might result from compensation for "actual cash value alone." 12A Steven Plitt et al., *Couch on Insurance* § 176:56 (12th ed. 2025). For instance, if hail destroyed a ten-year-old roof, a policyholder entitled to "Actual Cash Value" would recover the value of a ten-year-old roof, only to find that ten-year-old shingles are not readily on the market and that new shingles cost much more than ten-year-old shingles are worth. Schoening's additional coverage avoids this problem by paying for the purchase of new shingles.

Before Schoening can claim the full payment, the Optional Coverage provision requires Schoening to "actually repair[]" the property. R.4-1 at 58–59. In the event Schoening does not repair the property, Schoening's recovery reverts to the property's "Actual Cash Value." R.4-1 at 58. The provision also says that Schoening has the option to immediately recover "Actual Cash Value" and later elect to begin repairs and claim the value of the additional coverage. R.4-1 at 58.

By the terms of the Valuation and the Optional Coverage provisions, Schoening does not qualify for a depreciation-free payment. "[I]n an action on an insurance policy, the insured must prove compliance with the policy's conditions precedent . . . to recover under its terms." *Est. of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 406 (6th Cir. 2005) (quoting *Am. Centennial Ins. Co. v. Wiser*, 712 S.W.2d 345, 346 (Ky. Ct. App. 1986)). The additional coverage requires Schoening to repair the property before it may recover a depreciation-free payment. Schoening at no point has claimed that it repaired the property. Schoening thus may not claim a payment "without deduction for depreciation." R.4-1 at 58. It may claim only a payment for "Actual Cash Value" less a "deduction that reflects depreciation." R.4-1 at 59.

Schoening resists this conclusion on several grounds, each unavailing. It argues that the Valuation provision does not apply if Cincinnati Casualty opts to pay the cost of repairs rather than the value of the entire building. Schoening cites the provision's pledge to pay "the value of [the] Covered Property in the event of direct 'loss,'" R.4-1 at 55, which it claims must refer to the whole building and thus not apply to a loss damaging only part of the property. This interpretation runs into a number of problems. Most seriously for Schoening, the policy covers only "direct 'loss' to Covered Property." R.4-1 at 24. If "Covered Property" loss does not

include partial loss, then it is unclear how Schoening could recover anything in the first instance. It is fortunate for Schoening, then, that the policy defines "Covered Property" to include the "building or structure," which in turn includes "outdoor fixtures," "Building glass," "Signs," and so on.  R.4-1 at 24.  Putting this definition into the Valuation provision, "the value of Covered Property" allows appraisal (for example) of the "value of" "outdoor fixtures."  The policy thus plainly anticipates the possibility of a partial loss well shy of the entire building.

Schoening separately claims that the Valuation provision's use of the term "replacement cost" indicates that the provision does not apply to repairs because the policy routinely distinguishes between repair and replacement.  The policy's language indeed shows a difference between "repairs" and "replacements."  *See, e.g.*, R.4-1 at 32 (providing for possibility of a "[d]elay in rebuilding, repairing, or replacing"); R.4-1 at 37 (explaining lack of coverage for regulatory compliance "which requires the demolition, repair, [or] replacement . . . of property"); R.4-1 at 45 (extending coverage to "repair or replacement of damaged glass"); R.4-1 at 52 (noting that Cincinnati Casualty has option to directly "[r]epair, rebuild or replace the property" rather than paying a cash settlement).  The key to understanding the Valuation provision, however, is that it discusses "replacement *cost*."  It does not reference the physical act of "replacement," and thus does not suggest a different treatment for "repairs."  Confirming this understanding is the Optional Coverage's promise to pay "replacement cost" for both "repairs" and "replacements."  R.4-1 at 58–59.

Schoening adds that interpreting the Valuation provision to apply to repair costs would create superfluous policy terms.  It points to the district court's "conce[ssion] that it is potentially troubling that the Actual Cash Value definition" equates "the value of the damaged property, the cost of its repair, and the cost of its replacement" by setting each to "replacement cost less a deduction that reflects depreciation."  R.17 at 9 n.10 (quotation omitted).  Yet, as the district court correctly recognized, that equivalence follows from the policy's language.  It allows Cincinnati Casualty to select one of three payments in the event of loss:  "the value of lost or damaged property," the "cost of repairing" that property, or "the cost of [] replacing" that property.  R.4-1 at 52.  The policy proceeds to assert that "the value of lost or damaged property," "the cost of its repair," and "the cost of its [] replacement" will each be

"determine[d] . . . in accordance with the applicable terms" of the Valuation provision, which refers to only one method of valuation: "Actual Cash Value." R.4-1 at 52, 55, 59. While we have no quarrel with the canon against surplusage in the abstract, it should not be used to override the text of the contract and the context in which it appears—here, "an insurance contract that rejoices in overlapping terms and concepts." *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 404 (6th Cir. 2021); *see Heltsley v. Life & Cas. Ins. Co.*, 185 S.W.2d 673, 675 (Ky. 1945).

Even on its own terms, the anti-surplusage canon misfires in light of the policy's language. Schoening disregards the provision's only means of valuing "the cost of [the lost or damaged property's] repair," leaving the method of valuing the cost of repairs entirely unspecified. R.4-1 at 52. This lack of specification seems particularly unlikely in an insurance contract. *See McEachin v. Reliance Standard Life Ins. Co.*, 121 F.4th 571, 575 (6th Cir. 2024). Applying the Valuation provision to "the cost of repairs" allows for valuation in the event of "a partial loss," just as applying it to the "value or replacement cost" of the property allows valuation in the event of "a total loss." *Hornback v. Hornback*, 667 S.W.2d 399, 402 (Ky. Ct. App. 1984). Instead of creating surplusage, this interpretation provides the only way to "giv[e] effect to all parts and every word in" the policy. *Phoenix Ins. Co. v. Wehr Constructors, Inc.*, 134 F.4th 933, 942 (6th Cir. 2025) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384–85 (Ky. Ct. App. 2002)).

Schoening also points to a host of cases and treatises that require payment for repair costs without a depreciation deduction. Schoening uses these authorities to suggest that "cost of repair" serves as a term of art that means something different from replacement cost or "Actual Cash Value" and, at all events, does not include depreciation. But none of these cases or treatises considered a policy that, as here, equates repair costs with "Actual Cash Value" and defines "Actual Cash Value" to include a deduction for depreciation. *See, e.g.*, *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 371 (Ky. 2000); *Tri-Valley Plastics, Inc. v. Hamilton Mut. Ins. Co.*, 2003 WL 22272123, at *2 (Ky. Ct. App. Oct. 3, 2003); *Cincinnati Specialty Underwriters Ins. Co. v. C.F.L.P. 1, LLC*, 2015 WL 5793951, at *3 (W.D. Ky. Sept. 30, 2015); Linda G. Robinson & Jack P. Gibson, *Commercial Property Insurance* (IRMI 2025). "The

difference in language demands a difference in meaning." *Gallo v. Moen Inc.*, 813 F.3d 265, 270 (6th Cir. 2016).

A policy, sure enough, may "expressly provide that in cases of partial loss, in calculating the cost of replacement or repair, depreciation is not to be considered." *Couch on Insurance* § 178:7. Yet parties may also agree that "deductions will be made for depreciation." *Id.* That's why the Fifth Circuit, in looking at a policy with an identical "cost of [] repair . . . in accordance with the applicable terms of the Valuation" provision, accepted without concern that the Valuation provision applied to the cost of repairs. *S. Ins. Co. v. Affiliated FM Ins. Co.*, 830 F.3d 337, 340, 344–45 (5th Cir. 2016).

Schoening argues for the first time in his reply brief that, even if the Valuation provision and its "Actual Cash Value" term apply, the comprehensive nature of the policy's approach to repair-cost coverage supersedes them. As Schoening correctly notes, the policy references repair in the context of fences, fungi, and fire extinguishers (to name a few examples), and none of those other references mentions depreciation. But this argument runs into two problems. The first is that Schoening waited until its reply brief to raise it. That is too late. *Grand v. City of University Heights*, 159 F.4th 507, 516 (6th Cir. 2025). The second problem is that this interpretation would override a specific, on-point policy provision with the negative implication of terms inapplicable to valuation. That turns customary interpretive rules upside down. "[S]pecific clauses in insurance policies control general clauses." *State Auto. Mut. Ins. Co. v. Ellis*, 700 S.W.2d 801, 803 (Ky. Ct. App. 1985). The policy deploys the Valuation provision, no surprise, to value the cost of repairs. That same provision explains how Cincinnati Casualty will pay "the cost of building repairs" given its coinsurance requirements, just as it warns that the "cost of building repairs . . . does not include the increased cost attributable to" construction code changes. R.4-1 at 55. Schoening points to no provision that plausibly supersedes this detailed language.

On this point, it is telling that Schoening omits mention of the one part of the policy that does modify the Valuation provision—the Optional Coverage provision. That coverage, recall, "replaces" an "Actual Cash Value" settlement with "Replacement Cost [] without deduction for depreciation" once Schoening repairs the property. Schoening's interpretation of the baseline

contract renders this additional coverage unnecessary. But this raises the question of why Schoening paid for the additional coverage in the first place. It also ignores the basic principle that "[i]nsurance which covers the full cost of repair . . . without deduction for assured depreciation" demands "a higher premium," as it "force[s] [the insurer] to pay for erecting what is in effect a new building." *Reliance Ins. Co. v. Orleans Par. Sch. Bd.*, 322 F.2d 803, 808 (5th Cir. 1963); *see Couch on Insurance* § 178:7.

More, Schoening's interpretation would allow it to receive a "without deduction for depreciation" payment even though the Optional Coverage provision conditions that payment on the completion of repairs. R.4-1 at 58. All of this shows why Schoening's interpretation makes little sense "against the backdrop of 'the contract as a whole.'" *Russell v. Citigroup, Inc.*, 748 F.3d 677, 681 (6th Cir. 2014) (quoting *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)).

If all else fails, Schoening maintains, the provision at a minimum is ambiguous and thus should be construed in Schoening's favor as the policyholder. *See Hill v. State Farm Mut. Auto. Ins. Co.*, 709 S.W.3d 232, 239 (Ky. 2025). This argument is too late and too little.

The argument is too late because Schoening did not raise it below. A party forfeits an argument by raising it for the first time on appeal. *Corridore v. Washington*, 71 F.4th 491, 500 (6th Cir. 2023).

Schoening claims that ambiguity arguments are not subject to forfeiture and points to an out-of-circuit case ruling as such under Oklahoma law. *Edens v. Neth. Ins. Co.*, 834 F.3d 1116, 1124 (10th Cir. 2016). But this contention has no support within our precedents. *See Bellwether Cmty. Credit Union v. CUSO Dev. Co., LLC*, 566 F. App'x 398, 403 (6th Cir. 2014) ("Bellwether did not argue that the Operating Agreement was ambiguous in the district court below, and it cannot do so now."); *Harps v. TRW Auto. U.S., LLC*, 351 F. App'x 52, 57 (6th Cir. 2009) (per curiam) (same). The realities of this case offer good reason to stand by our general rule. Kentucky courts resolve ambiguous contracts by looking to extrinsic evidence such as party circumstances and prior negotiations. *Frear*, 103 S.W.3d at 106. If accepted, Schoening's argument would require an assessment of "not only a new issue but also new evidence," which

"is exactly what our forfeiture rules protect against." *Parker v. Winwood*, 938 F.3d 833, 838–39 (6th Cir. 2019). Schoening's decision not to raise contractual ambiguity below, moreover, apparently resulted from strategy rather than neglect. Below, Cincinnati Casualty argued that the putative class lacked predominance because its members hailed from States whose contract law treated ambiguity differently. Schoening sidestepped this argument by asserting that the policy's language was "clear." R.13 at 7, 12. Excusing Schoening from that choice would fall well outside the "narrow" exceptions to our party presentation rules. *In re Bayer Healthcare & Merial Ltd. Flea Control Prods. Mktg. & Sales Pracs. Litig.*, 752 F.3d 1065, 1078 (6th Cir. 2014).

Schoening's ambiguity argument also is too little. An insurance policy is ambiguous under Kentucky law only if it is capable of more than one reasonable interpretation. *Frear*, 103 S.W.3d at 106 & n.12. As the preceding analysis shows, the policy clearly provides that the "cost of [] repair" equals "Actual Cash Value" equals "replacement cost less a deduction that reflects depreciation." Schoening's interpretation would leave the "cost of [] repair" undefined and the Optional Coverage provision without purpose, which can hardly be called reasonable. To the extent Schoening's interpretation relies on the overlapping meaning of repair and replacement costs, "surplusage alone does not make an insurance policy ambiguous." *Santo's*, 15 F.4th at 405 (quotation omitted). The anti-surplusage canon, it's well to remember, "is one among many tools for dealing with ambiguity, not a tool for *creating* ambiguity in the first place." *Id.* To the extent that Schoening relies on the district court's speculation that "various" other parts of the contract might be "ambiguous," R.17 at 2, that ambiguity is "irrelevant" because "[n]o ambiguity exists in the language" of the Valuation provision itself, *Davis v. Progressive Direct Ins. Co.*, 626 S.W.3d 518, 522 (Ky. 2021).

We affirm.